```
McGREGOR W. SCOTT
United States Attorney
CARL M. FALLER, JR.
Assistant U.S. Attorney
2500 Tulare St., Suite 4401
Fresno, California  93721
Telephone:  (559) 497-4000
```

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 1:06 CR 00426 OWW |
| | ) | |
| Plaintiff, | ) | MEMORANDUM IN SUPPORT OF |
| | ) | DETENTION |
| v. | ) | |
| | ) | Date: January 8, 2007 |
| TALAL ALI CHAMMOUT, | ) | Time: 9:00 am |
| | ) | Courtroom: 3 |
| Defendant. | ) | Honorable Oliver W. Wanger |
| | ) | |
| _____ | ) | |

TO: THIS HONORABLE COURT, DEFENDANT TALAL ALI CHAMMOUT, AND HIS ATTORNEY OF RECORD, ROGER T. NUTTALL.

The United States submits the following memorandum in support of the defendant's continued pretrial detention.

INTRODUCTION

On December 7, 2006, the defendant was arrested following his purchase of five firearms which he believed to be stolen government property. He was subsequently charged by complaint with being a Felon in Possession of Firearms, in violation of Title 18, United States Code, Section 922(g). This was based on a 1995 conviction in Tulare County Superior Court for Assault with Force Likely to Produce Great Bodily Injury, in violation of

1

California Penal Code Section 245(a)(1).

On December 15, 2006, the defendant had a detention hearing before the Honorable, Lawrence J. O'Neill, United States Magistrate Judge. At that hearing, the court determined that the government had shown by clear and convincing evidence that no condition or combination of conditions would secure the safety of the community if the defendant were released, and he was ordered detained.

On December 21, 2006, the defendant was indicted by the Grand Jury and charged with one count of being a Felon in Possession of Firearms and an additional count of Conspiracy to Possess Stolen Government Property, in violation of Title 18, United States Code, Sections 371 and 641. That charge was based not only on the defendant's purchase of the five pistols, but also on his purchase of bullet proof vests, night vision goggles and chemical protection suits. In addition, during the course of the conspiracy, the defendant negotiated to purchase AT-4 anti-tank rockets and Stinger anti-aircraft missiles for delivery to a country outside of the United States.

## ARGUMENT

In 2003 the law enforcement received information that the defendant was purchasing a variety of types of firearms and possibly shipping them outside of the United States. Based upon this information, the Fresno Joint Terrorism Task Force commenced an investigation. At the defendant's detention hearing, the Magistrate Judge considered the following facts, which he found persuasive:

During the early stages of the defendant's discussions

with the government's cooperating witness (CW), the defendant expressed an interest in purchasing stolen government property, particularly Beretta pistols.

The defendant actually purchased ballistic vests, night vision goggles, and chemical protective suits which he was told had been stolen from Lemoore Naval Air Station.

In February of 2005, the defendant indicated to the CW that he needed a gun with a silencer, and then indicated that he would like to meet a "friend" of the CW who was represented to be a contract killer. Based on telephone conversations with the defendant, an undercover FBI agent traveled to Porterville from the east coast, and posed as a hit man. The defendant had multiple meetings with the undercover agent and ultimately did not hire him to kill anyone, and did not identify the potential target.

On March 19, 2005, the defendant traveled to Dearborn, Michigan, the home of his estranged wife. He arrived unannounced on her street and appeared to be conducting surveillance on her residence. After being told to leave the area multiple time by the local police department, he was eventually discovered in his wife's house after she had been alerted to leave by the FBI. To the officers and agents involved, it appeared that he was attempting to make the scene appear that a residential burglary had been taking place in anticipation of her returning to the residence and ending her life. It bears noting that the defendant's wife reported that in July of 2004, while on a family trip to Lebanon, the defendant had obtained an order from a religious court in that country forbidding their three children

from returning to the United States.  She stated that the defendant physically assaulted her and threatened to kill her if she did not return to the United States without her children.  She eventually returned alone, but the defendant was subsequently ordered to return the children to the United States during the dissolution of marriage proceeding in Tulare County.

In September of 2005, the defendant told the CW that he was interested in acquiring rocket launchers, and during October and November he said he wanted AT-4's delivered to Iraq.  He said that he had previously tried arms deliveries in Canada and Mexico but had problems in both places.

In February of 2006, the discussions turned to Stinger anti-aircraft missiles.  During the negotiations for the purchase of the Stingers the defendant told the CW, "If this ever gets out, you're dead."

During March of 2006, the discussions continued about delivery of the Stingers in Jordan and other countries, but no agreement could be reached on a country where the defendant felt safe and the FBI could conduct law enforcement operations.  In June, the CW offered to conduct the transaction in Turkey, but the defendant rejected that proposal, also.

On September 19, 2006, the defendant again said he wanted to pursue the purchase of the stingers, and that he needed them in Iraq.

At a meeting with the CW on October 4, 2006, the defendant said he was still interested in acquiring stolen Berettas, but, at a subsequent meeting on November 21, 2006, the defendant again said that he was still interested in the Stingers.

4

On December 7, 2006, the defendant purchased five Beretta pistols from the CW for $1,000. Before he would handle the pistols, he put on plastic gloves, apparently to keep from leaving his finger prints on the weapons.

Following his arrest on December 7, a search of his business location revealed an additional 40 firearms, including 3 AK-47 assault weapons and a TEC-9 pistol. There was also a large cache of ammunition, as well as speed loaders containing ammunition that would be capable of rapidly loading magazines for the AK47's. Those are items commonly used only for military applications.

In addition, the FBI has also discovered a safe deposit box which the defendant was maintaining in Las Vegas which contained approximately $80,000 in currency. Efforts are continuing to determine if the defendant has cash stashed in additional locations.

Based on the facts noted above, it is clear that the defendant constitutes a danger to the community if released and that no pledge of monetary assets will obviate that danger.

## CONCLUSION

The defendant's motion to revoke the detention order should be denied.

DATED: January 3, 2007
Respectfully submitted,

McGREGOR W. SCOTT
United States Attorney

By      /s/
CARL M. FALLER, JR.
Assistant U.S. Attorney